BOSCH v. PYLON MFG CORP Good morning, Your Honors. Mr. Chief Judge, may it please the Court. The parties have briefed a number of different issues in this patent appeal. We noticed. I'd like to try and focus on two of them unless the Court suggests otherwise. The second of the two that I wanted to address is the derivation finding with respect to Claim 1 of BOSCH's 974 patent. But the first issue that I wanted to address is this Court's jurisdiction to hear the appeal. This is an interlocutory appeal. The District Court has not yet completed discovery or held a jury trial on issues of damages and willfulness. Because there's no final judgment, this Court has jurisdiction, if at all, only under Section 1292C, which requires a case that is final but for an accounting, and a jury trial is not an accounting. We do have a fair number of cases where we have said that damages and accounting can be equated, don't we? There are, I think, a single-digit number of cases in which the Court has said, almost uniformly in dicta, that damages and accounting can be equated. And it's not necessarily wrong, by the way, to say that damages and accounting can be equated because an accounting can be part of a damages computation. In fact, we still do, contrary to Piland's arguments, we do still do accountings today. There was a Talportia case just a couple of years ago where the district judge ordered an accounting of sales from one date to another date in order to fix damages. This Court affirmed that quite properly. And so accountings do continue to happen, and so to say that damages and accounting can be equated, in some cases they can, but what can't be equated is a jury trial on patent damages and an accounting. Those are two different procedures, Your Honor. I think there's something you said, though, that I think is important, and you said almost uniformly in dicta. Even if I agree with you, isn't it a problem that this panel would have difficulty changing course and correcting the law, as you would argue? Wouldn't we have to do that with an en banc? I don't think so, Your Honor. I have a list of the cases that the parties addressed in their briefs, and I think both sides looked hard to see where this issue had been addressed before. In none of the opinions was the issue actually raised and argued. There isn't an opinion from this Court that says a jury trial is an accounting, therefore we have jurisdiction, which is what the finding would need to be in this case. Doesn't the policy goals or the legislative purpose behind 1292C2 compel us to treat damages as an accounting? I don't believe it does, Your Honor. I don't believe it does. The policy purpose behind 1292C2 was to let parties proceed with an appeal without waiting for the delay of having a special master conduct an accounting, which can be, especially in the days before computers, could have been a very long procedure where the accountant special master goes through the books of account. Since the statute was amended and an accounting or instances when accounting has been ordered just greatly reduced and the attention and expense that went into the damages is shifted over to the compensatory damages, doesn't the policy goal still apply that the amount of resources and effort expended into determination of damages should weigh the determination on the appeal on merits? I don't think so, Your Honor. I disagree on two points with respect. The first is that there's no need for a jury trial on damages to delay anything. If this case had not been bifurcated, we would be done already, and we would have a final judgment and we would appeal and we would not be doing piecemeal litigation, which is what we're doing in this case, in which the overwhelming policy of years of jurisprudence is to avoid piecemeal litigation. We don't do it in other kinds of cases. We do it in admiralty cases because there's a special statute that says we can, but we don't do it in general. And the other thing that I disagree with is that the policy… Well, let me leave it at that. There's no delay necessarily. And to return to the question about our prior cases, almost all of the cases that I have seen in which mention the idea that damages and accounting are the same thing, again, as I said, that's not really the question. The question is jury trial, whether the jury trial is the same as an accounting. But all of those cases, or most of them, I should say, quite clearly have proper interlocutory appeal jurisdiction because an injunction was ordered or denied. And in those cases, one can go up under 1292C1. And so when I say addicted, that's really what this is, addicted. So is it your position that none of those cases… Now I agree with you that none of them really analyze this question very well, but there are holdings in them, or at least there are results in them. Is it your position that not a single one of those cases actually contains a binding conclusion that a jury trial for damages is the same as an accounting? I do take that position, and the only caveat… How about CalMAR? CalMAR is the attorney fees case where it's reversed solely because of the argument that 1292C is not a jurisdictional bar. Your Honor is, of course, correct that CalMAR was a mandamus action on a sanctions order. The question was whether the lawyer had so badly misrepresented the law to the district judge about staying, whether a damages case could or should be stayed, that he ought to be sanctioned. We have held the district court saying he could stay. No, we reversed it. But we upheld the principle that the district court could stay the proceedings for damages and thus, yes, reversed the holding that the attorney had stated the law correctly. I think really the holding of CalMAR is that the lawyer had not so badly misstated the law that he should be sanctioned, and nobody is suggesting that Pylon should be sanctioned for making the argument that it has. Clearly, that's not the case because there is dicta that goes on for years. But CalMAR is not a case where the jurisdiction depended on it. In saying he didn't so badly misstate the law, didn't Judge Markey at that point say the reason he didn't badly misstate the law is because the law is precisely what he said it was? He did. What he said, actually, was he discussed the object of the predecessor statute to 1292C and cited to equate it, as the owner suggested before, damages and accounting and pointed to the Supreme Court's 1947 McCullough opinion. The problem with relying on McCullough for this proposition is that McCullough was a case under the old statute where what the remedy in question was, in fact, an accounting. So McCullough doesn't really help us at all in the question of whether a jury trial is an accounting. The only caveat that I had mentioned was... That goes back to my original point, though, isn't it? That even if he was wrong, even if citing McCullough was wrong, we have an opinion that we're stuck with? I don't read CalMAR as being a holding on the court's jurisdiction. I read CalMAR as a holding that the lawyer did not commit a sanctionable act, which I believe to be different than holding that the court does, in fact, have jurisdiction. Do you want to talk to me about derivation? I certainly do, Your Honor. The derivation case comes down to a credibility contest between people in a room many years ago. Then how do we get past a jury verdict? We get past the jury verdict because, first of all, the issue should not have gone to the jury, and we should reverse the jury verdict because there was not a sufficient evidentiary record of corroboration. The reason I say it was a credibility determination is because that is all that it was. There was some corroboration, though, wasn't there? No, Your Honor, I don't believe there was. The question on derivation is what happened in that conference room in Germany, I think 17 years ago now. And on one side we had the German, one of the German inventors, who says that he and his colleague presented the idea to the South African businessman. On the other hand, we have the South African businessman who says, no, I thought of it first and I told them about it at the meeting. And what I'm focusing on first is, and I told them about it at the meeting. There's no corroboration at all of his account, none. He has notes that he took that show the idea. But those notes don't show whose idea it was. What are the limits on this corroboration rule? I mean, you know, under normal circumstances, in any other context, parties go in court, they testify, the jury gets to assess credibility, they either believe them or they don't. And now we're saying that, you know, if somebody's your friend or somebody's your business colleague, that somehow their testimony is not sufficient to corroborate your own sworn testimony. We are saying that, but we don't even get to that question in this case, because there was no friend or business colleague in the meeting who testified at the trial. There was a business colleague with Mr. Fearson, the South African businessman, at the meeting. He didn't testify at the trial. He's not in the record. So we don't have that question of quite how far that goes in this case. Although I would say, in this case, the South African businessman's colleague, Mr. Schwannepohl, his testimony I don't think would be enough, even if he had been in the room, because he is very definitely an interested person. Not only does he claim to be an innovator in this field, not only is he associated with Mr. Fearson, but he's a consultant for a Bosch competitor that's now embroiled in litigation with Bosch. This is a development since the parties filed their briefs, so we might need to update our statement of related cases, I suppose. What about the contemporaneous notes? Now, I know they weren't definitive, but there were certainly notes that were drawings that were done during the course of the meeting. Doesn't that support the notion that these issues were discussed in that meeting? Those issues were discussed in this meeting. There's no doubt, I think, in anybody's mind that these issues are discussed in the meeting, and Mr. Fearson's notes look almost exactly like the patent drawings that Bosch filed when he filed his patent application. Did Jens Schwanepoel testify as to the source of the diagram, that the diagram existed before the meeting? No, I don't believe he did, Your Honor. Mr. Schwanepoel testified he had no idea what happened at the meeting, and he derived all of his knowledge, speaking of derivation, he derived all of his knowledge about what happened at the meeting from those notes. He did testify that he and Mr. Fearson had discussed the idea before the meeting, but not those notes. Those notes are a record of what happened at the meeting. If you look at them, there's somebody taking notes of ideas that somebody is presenting, and they don't say this was something Bosch presented, and they don't say something was... What about the circumstantial evidence that Judge Robinson cited at some length? I mean, if what we're trying to do is make sure that an inventor's own testimony is reliable, doesn't that circumstantial evidence help support that testimony or corroborate that testimony? Well, I'm not sure about the term circumstantial evidence. I mean, the policy, going back to the barbed wire patent cases, is we're not going to let oral testimony alone take a patent away from somebody, especially after so long, and all of a sudden it's in litigation years and years and years later, and now somebody comes along and we're going to take the patent away. The policy is we don't do that absent clear and convincing evidence, and it has to be not just one person's testimony. The question of what you need more than one person's testimony, if you look at the cases on this issue, all of them have either some disinterested third-party witness or else some written evidence of where the idea originated or what's in question is the communication, what was communicated. Ethicon is the only decision of which I'm aware in which anything like what you might call circumstantial evidence was held to be outcome dispositive or to be sufficient corroboration, and that was an unusual case in that the named inventor was not an electrical engineer and didn't have anything like the technical knowledge required to make the drawings, the notes, the ideas that were in the electrical engineering part of the invention. It was a surgical invention that had mechanical and electrical features. Would you like to save a little rebuttal time, Mr. Haneman? I'm happy to do that right now. Thank you. Thank you, Your Honor. Mr. Pauls? Good morning. May it please the court, as counsel indicated before, there are a number of issues. I'd like to focus on three of them. One is the derivation question. I also want to address briefly the claim construction issues on the 434 patent and the 905 patent. So turning first to the derivation question. Can you just briefly address the jurisdictional issue? And I know that there are briefs relating to the motions practice, but do you agree that there's no binding holding in our case law with respect to this issue? I believe that the court has ruled that there is jurisdiction. And I have not seen detailed analyses of that, but I believe that there is authority. Does the same hold true that we have jurisdiction over the willfulness issue? Is there a binding Federal Circuit precedent? The willfulness issue is not presented here, Your Honor. So the only issues presented here are the liability issues, the infringement and invalidity issues. I think Judge Ray's claim is not whether willfulness is here on appeal, but whether given that there has not been a willfulness determination yet and that that has also been bifurcated, does that affect the finality of this appeal? I don't think it does. I think, again, there's precedent where damages issues along with willfulness issues, which in part goes to the monetary award component to the litigation, where that's been bifurcated and dealt with. With respect to willfulness, which cases are you referring to? I don't recall their names, Your Honor. This was briefed. The jurisdiction issue was briefed long ago. We've got two orders on it in this case. And I don't recall the particular authorities. I apologize. If we find that we have jurisdiction on the cases and the bifurcation with respect to damages was not there, are we able to decide that the bifurcation with respect to willfulness was there and dismiss the case? We'd have to go against the Callaway case. I think that's right. The Callaway case has taken jurisdiction where willfulness was bifurcated, right? I believe that's right, Your Honor. Is that a precedental opinion? I don't remember that, Your Honor. I don't remember that. But I know there is authority that the court has done precisely what's being done here. And that question, I think, is something that this panel would need to go against prior to decisions. I don't know whether the Callaway, I don't recall whether the Callaway opinion was precedential, I apologize. We took jurisdiction. We just didn't discuss this issue. But it had willfulness in it, and we took jurisdiction. So the holding suggests that we had jurisdiction. Yes. From a derivation standpoint, Your Honor? Your derivation depends on Swanepoel, right? No. I mean your corroboration. The corroboration analysis really is the rule of reason analysis that the court applies. But corroboration is a pretty set rule. And what's your hope for corroboration here? Corroboration depends on the entire set of facts and circumstances that were presented. None of it can come from the inventor. So you don't get anything that is not corroborated outside the inventor, right? Correct. The inventor cannot corroborate himself. So who do you have besides the inventor? We have Swanepoel. Swanepoel you put forth as an inventor, thereby precluding him as a corroboration completely, because you put him forth as an inventor, right? He was found not to have been an inventor. But you put him forth as an inventor, admitting that he was an inventor and precluding his ability to corroborate. He is not a... And that's a legal question. When you put him forth as an inventor, don't you automatically concede that he cannot corroborate? I think Swanepoel's testimony, Your Honor, is that he was not an inventor. So whether the... You put him forth as an inventor. Did you preclude his eligibility to serve as a corroborating witness? I don't think we removed all ability for him to corroborate across the entirety of the issues that were presented. He was presented as providing... When you put him forth as an inventor, don't you have to take all the consequences of that action? We do take the consequences of that, Your Honor. And one of those is an inventor cannot corroborate. He's not an inventor. But you put him forth as an inventor. You held him out as an inventor, and now you can't also hold him out as a corroborator, can you? But he is not the sole corroborating testimony. Okay, what else do you have? So we have his testimony, we have his documents. He's got some memoranda. But remember, anything from him as an inventor cannot corroborate. So he's off the table. And what else do you have? We have Merkel's testimony. Now, does it matter that the jury decided that he was not an inventor? I think it does. I think it matters because he was not an inventor, and his testimony was that he was not an inventor. So whether the belief of counsel had been that he contributed, he said he didn't. And he said, Pearson did it, not I. But he wasn't in the room for the critical meeting as it relates to Claim 1, was he? Well, the meeting was critical, but only in part, Your Honor. So what we have is we've got this story where undoubtedly and undisputedly Swanepoel and Pearson are doing work on a beam blade and Bosch was not. Swanepoel and Pearson, as an ethicon, are responsible for addressing particular issues with respect to performance of that product, including the wind lift issue. Swanepoel proposes a spoiler. Pearson doesn't like it. Does Swanepoel say he may have made a contribution to the invention? He says he didn't do it. He said it was Pearson. Did he say he may have made a contribution to the invention? I don't recall him saying that he made a contribution to this invention, Your Honor. He said it was Pearson. When you get a chance, look at A8721, will you? A8721. I will, Your Honor. So he has this base blade, and Swanepoel's contribution, and maybe that's embodied in these embodiments, which of course we're referring to as the beam, rather than the wind deflection strip, which is the focus of what's going on with respect to the 974 patent rather than the beam. But in any event, Merkel testifies at A7921 and 7929 that it was all Pearson and the AMIC people on the wind deflection strip and wind lift, that Bosch hadn't even looked at the issue prior to this meeting. We've got testimony that Pearson had conceived it going into the meeting. At A10175, we have Pearson's drawings of the two embodiments that were discussed at the meeting, the so-called inclined beam embodiment and the wedge, the flexible wedge spoiler. Was there any evidence when that drawing was actually created? Yes. The testimony and the agreement is that it was created during the meeting. Bosch's view is that Pearson copied what was drawn at the chart, so they acknowledged that these are meeting minute notes. He also showed them to Swanepoel after the meeting within a week or two, those meeting notes, we know they're contemporaneous, and said these are what I told Bosch at the meeting. But that's completely hearsay. He said that to Swanepoel. But it doesn't say without objection it was admitted? Yes. So what we know is that first drawing, the top drawing, the so-called inclined beam drawing, that was Pearson's idea. Pearson proposed it at the meeting and they admitted it. Well, we know that Pearson said that. And they admitted it. Merkle admits it. That which one was it? That the inclined beam design was Pearson. So Bosch's response is, well, it's not credible that Pearson would have written these drawings in his notes. It's much more credible that Merkle went up to a flip chart and wrote them down. Well, we know that's wrong because the inclined beam drawing, which Bosch admits is Pearson's, is right there on the same page, right above the wedge spoiler design. So it's now Pearson and Swanepoel see all of this in 97 and don't object to it being attributed to someone other than them. Is that damaging to your case? So I disagree. Amick objected to Bosch's patenting activities. And the fact that Amick didn't sue Bosch, one of the biggest companies in the world, in the United States to press this issue, I don't think it goes to this issue and I don't think that's something that sways this question. I think what's more important is that prior to the meeting, Bosch had done nothing on the issue. After the meeting, Bosch did nothing on the issue until they misappropriated Pearson's inclined beam design and until in 1996 they generated their first document reflecting either design. What's the impact of the derivation finding as it relates to the patent as a whole? So the impact of the derivation finding as a patent as a whole, as we indicated in our brief, is that under 102F and 256, that invalidates the patent. Why didn't you make that argument below to the trial court? That specific argument, admittedly, was not made to the trial court. There were arguments made about the consequences of a derivation finding and about the consequences of not correcting inventorship. But isn't the fact that the specific argument wasn't made below a problem for you here? No, because that argument, that issue didn't arise until the district court overturned the jury's verdict on Claim 8. Because until the judge granted their JAMAL on Claim 8, Claim 1 was invalid, Claim 2 was invalid, and Claim 8 was invalid. So all the claims that were at issue stood invalid before the district court until the judge reversed and granted JAMAL on Claim 8. And then this issue becomes relevant to our case. I mean, the derivation and incorrect inventorship could be relevant to 3, 4, 5, 6, and 7. But then also, 256 doesn't become relevant until that point either. So without you making the argument that it's invalid as a whole, then Bosch was not in a position to seek 256 relief, right? No. 256 was relevant from the moment we said there's derivation and the inventorship on this is incorrect. And we said... But wouldn't, if they seek a correction of inventorship when they don't agree that they need to, wouldn't that be completely at odds with the position they're taking at trial? No. It's done all the time, actually. It's sort of a, the inventorship is correct. If not, then the inventorship was, the difference was not with the deceptive intent. Inventorship should be corrected. But the issue is, the misguidance that Bosch gave to the district court was, this was always a joint inventorship case. Because Claims 3, 4, 5, 6, and 7, and 2, actually, derivation on those claims was never presented. So, at most, Fearson could have been a joint inventor on this patent. Because the named inventors, there was no ability for the court or the jury to say that Fearson was the sole inventor of 2, 3, 4, 5, 6, and 7. So this was always a joint inventorship case and it always presented this question of correction under 256, which they very strategically chose to argue to the court and convince the court not to allow the jury to be instructed and not to proceed on that. And, of course, the reason they did that is because once they correct inventorship, they've got another party on the patent, there's a co-owner, and they don't have standing to pursue the case. So that's their strategic call. It's too late now to make the correction. So we have, we've got derivation, we've got an inventor. That's the jury verdict form is that Fearson is an inventor, on Claim 1 and Claim 8. We've got, therefore, joint inventorship and co-ownership. They've chosen not to correct, and it's too late to do so. The rationale is in the patent case. That goes through the rationale that, you know, they've got the ability to correct at the district court. Too late now. Inventorship, they chose not to. It's not that it might have been corrected. The question is whether it was corrected, and they didn't do it. Before you run out of time, what's the most critical claim construction issue that you wanted to address? I think the most, the 905 patent claim construction and doctrine of equivalence that I think were set out in the papers, I'll just touch on the detent shoulder issue in the 434 patent briefly. The question there is really whether the claim is going to be construed to reflect what's in the written description, and what's written is requiring either a projection or a spring tab that projects outwardly from the support element. Figure 5 shows that you can brace without touching, right? That's a separate issue, Your Honor. No, Figure 5 actually shows touching of the termination part on the wiper strip, both at the little tab that sticks into the slot on the wiper strip as well as on the side of the wiper strip. So there is touching in Figure 5, and they're wrong on that. That's the bracing itself element, and the point is that there is touching in that circumstance. On the detent shoulder point, Figure 4, for example, clearly shows a spring tab sticking up. The other figures all show something projecting out from the support element. Before this case, that's exactly the position Bosch took. Bosch told AMIC when AMIC said, Hey, what are you doing? You're patenting our termination part, our end cap connection. They said, No, no, no. In your connection, there's a hole or a recess in the support element. In ours, we have something sticking out. It wasn't until this case when they came in and said, Oh, look at Column 2, there's this partial recess language. That allows us to claim holes. But the spec says it's possible to provide a detent shoulder on a peripherally open, partially disposed laterally on the support element, right? A peripherally open partial recess. That's what it says, Your Honor. Since 2008, they've never said what that means. No expert has said that was me, what that has meant. I don't know what that's meant. I've looked at this for 15 months since we got involved in this. What it can't mean, a partial recess can't be a hole. That's a full recess. And it can't be a cutout. Again, that's a recess. That's not a partial recess. But those are the only two things, the only two examples they've given of what this must cover, those are accused of vices. There's no indication otherwise. But it's a recess, not a protrusion, right? It's a partial recess. Well, that recess, not protrusion. We're already into something that is different from what you're telling us it has to be. No, it says that the shoulder is on a partial recess. An example of that might be, although I don't know, maybe that spring tab in Figure 4 is moved to the side. But you'd still have a projection. You might have a partial recess at the side, but a cutout, that would be a recess. And a hole, according to Column 1, that's a recess. Don't you have a waiver problem on this issue? I mean, the district court gave you a construction that you were not that unhappy with, but it was at the jury charge phase where the district court inserted some additional language that you now say caused a problem, right? No, we challenged the claim construction at the, obviously, the Markman stage. We briefed it. The judge rejected our position. The charge language I think you're talking about, Your Honor, again, the bracing itself, language with the indirect support. And at the jury charge conference, what Bosch did is said, we want more language inserted into this. We don't want to go with what's there. We want more language. We objected to the addition of more language. But really what it was, I mean, that all ties back to the claim construction and the judge's original position on that. Okay, thank you, Mr. Bosch. Thank you. Thank you, Mr. Hanneman. Your Honor, the Callaway case was a precedential decision. It was a case in which Judge Robinson entered an injunction, and this court properly had jurisdiction under 1292C1. The opinion in Callaway refers to both C1 and C2, but I don't think the issue was briefed at all because jurisdiction was clearly proper under C1. On the derivation point, one thing that should be said is that this is a commercially critical patent, the 974 patent that's the subject of a great deal of litigation right now, including litigation with Trico, the Bosch competitor for whom Mr. Swanepoel consults. Why didn't you object when Mr. Swanepoel was put forth as an inventor and also was a corroborating witness? Mr. Swanepoel testified at the trial as a fact witness, and we did, in fact, move pre-jury instructions to not have the derivation case go to the jury because there was not any independent evidence of corroboration and really no corroboration evidence at all of what happened in the meeting. The district judge disagreed with us. So the only thing that describes what happened at the meeting, other than the oral testimony of Mr. Pearson and the contrary testimony of Mr. Merkel, are Mr. Pearson's notes of the meeting. They don't say, as I've said before, whose idea this was and whether he was writing down what he was being told as he was elsewhere in the same set of notes or whether he was writing down his own ideas. There was a long list of cases. Mr. Merkel's testimony was not completely contrary, was it? I mean, it did support some aspects of his testimony. I don't think that it did, Your Honor. Mr. Merkel was very clear that this was an idea that he and Mr. Loich had developed during the year or so that they were working on this project before the meeting. It's not true that Bosch had not been working on this at all at the time of the September 1992 meeting. By then, they had spent substantial time working on it, had noticed the high-speed lift problems, and had had lots of internal discussions about potential ways of solving those. One of those ways is the way that they patented in the 974 patent. There's a long list of cases in our brief finding that notes like these are not enough because they don't tell you the key fact of who said what to whom. The meeting notes also go on to say that what Mr. Pearson wanted to work on when he got back to South Africa was the inclined bean idea. This was his idea, the inclined bean. It's something that a Bosch employee later thought of and was told by Mr. Merkel, nope, that's not our idea. Pearson thought of it first. Do you have a final thought, Forrester, Mr. Haneman? My final thought relates to the AMIC agreement, AMIC and Trico. AMIC was required to sue Bosch at Trico's expense if Bosch were using AMIC technology. AMIC sold the business to Trico. Trico had the power to say, Trico for whom Mr. Swanepoel is and was consulting had the power to say go sue Bosch at your own expense, get this straightened out. They had a correspondence with Bosch and declined to do so, and I think that's the most persuasive circumstantial evidence of all. All right. Thank you, Mr. Haneman. I don't think there was any comment on the cross-deal and your time's expired. Let's go on to...